UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>**OSAYANDE JOHNSON,**<br><br>**Defendant.** | Crim. No. 21-cr-707<br><br>OPINION ON MOTION TO SUPPRESS |

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on Defendant Osayande Johnson's omnibus pretrial motion requesting the suppression of evidence seized during the traffic stop that led to his arrest, suppression of his prearrest statements, and other miscellaneous relief. For the reasons articulated herein, the motion is **GRANTED IN PART** and **DENIED IN PART**.

I. PROCEDURAL BACKGROUND

On September 7, 2019, officers working as part of a Drug Enforcement Administration ("DEA") task force arrested Defendant Osayande Johnson ("Defendant" or "Johnson") during a traffic stop after finding narcotics in a Yeti-brand cooler stowed in the back of the pickup truck that Johnson was driving. Two days later, Defendant was charged by criminal complaint with conspiring to distribute and possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 21 U.S.C. § 846. On September 10, 2021, a federal grand jury returned an indictment against Defendant on two counts: Count One, conspiring to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 21 U.S.C. § 846; and Count Two, possessing with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

1

On May 23, 2024, Defendant filed his omnibus pretrial motion requesting the suppression of evidence and other miscellaneous relief (the "Motion"). Defendant seeks: (1) suppression of evidence seized from Defendant's rental vehicle; (2) suppression of Defendant's pre-arrest statements; (3) an order requiring the Government to produce information regarding the identity and role of the individual identified by the Government's Opposition as Co-Conspirator 1; (4) an order sequestering all witnesses at trial, including the case agent; (5) an order directing the Government to disclose any uncharged conduct pursuant to Federal Rule of Evidence 404(b)(3); (6) an order encouraging the Government to provide early disclosure of Jencks materials; (7) an order compelling the Government's agents to preserve their rough notes; and (8) an order granting the Defendant permission to file additional motions as may be necessary.

In support of his Motion, Defendant submitted an affidavit, ECF No. 79-3, alleging that during the traffic stop that resulted in his arrest, police officers immediately approached him with guns drawn, ordered him to exit his vehicle, and placed him in handcuffs. He also alleged that he heard officers attempting to smash open the cooler in the back of his truck and that he never consented to any search. These assertions raised material issues of fact bearing on (a) whether the traffic stop exceeded the bounds of a lawful investigatory stop as contemplated by *Terry v. Ohio*, 392 U.S. 1, 30 (1968) and its progeny; and (b) whether the Defendant was in custody during the stop such that his responses to officers' questions constituted custodial statements made without a *Miranda* warning. On July 30, 2024, the Court set the matter for an evidentiary hearing.

## II. HEARING

The evidentiary hearing took place on October 23, 2024. The Court heard testimony from three witnesses: Brian Greene, the retired Jersey City Police detective who arrested the Defendant while on assignment as a Task Force Officer to the DEA; Special Agent Dan Wherle, another member of the DEA task force; and the Defendant, Osayande Johnson.

When the Court rules on a motion to suppress after holding a hearing, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Folks*, 452 F. Supp. 3d 238, 249 (W.D. Pa. 2020) (quoting *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007)). The Court briefly summarizes its credibility determinations below.

### A. Detective Brian Greene

Detective Greene testified to his seventeen years of experience as a Jersey City Police detective assigned as a DEA task force officer. His duties included disrupting narcotics trafficking domestically and internationally. Greene testified that he conducted

over 1,000 narcotics investigations during his career and completed High Intensity Drug Trafficking Area and Narcotics Identification trainings.

Greene testified that on May 17, 2018, he and his task force took part in the investigation of a drug tracking and money laundering organization ("DTO/MLO") in Passaic, New Jersey. During the investigation, the task force witnessed the delivery of a large beige Yeti-brand cooler which turned out to contain nine kilograms of narcotics. Greene testified that the task force continued to investigate the DTO/MLO for more than a year, eventually leading to the initiation of mobile surveillance of one of the DTO/MLO members on September 7, 2019. That evening, DEA task force officers watched as the subject of their surveillance met briefly in the parking lot of an apartment building with Defendant Johnson. The DTO/MLO member removed another large beige Yeti-brand cooler from his car—a cooler which he had previously retrieved from a shipping container the task force suspected was used to store narcotics—and placed in the bed of the pickup truck that Johnson was driving. Greene then testified that the task force followed Johnson's vehicle after it left the parking lot, that he observed multiple traffic infractions, and that he decided to conduct a traffic stop. According to Greene's account, his gun was not drawn when he approached the Defendant's vehicle, he received Defendant's consent to search the Yeti-brand cooler upon request, and Defendant was not placed in handcuffs until after the contents of the cooler tested positive for narcotics.

Greene's testimony was forthright, was consistent with documentary evidence in the record, and was drawn from a compelling combination of professional experience, first-hand observations, and real-time involvement with the task force's investigation. Greene presented as credible and experienced.

### B. Special Agent Dan Wherle

Special Agent Wherle testified that he was a member of the task force that investigated the DTO/MLO. Wherle was present for the seizure of the first Yeti-brand cooler in May 2018 and received information thirteen months later that the same DTO/MLO was operating a narcotics distribution point in New Jersey. He responded to the site of Johnson's arrest on September 7, 2019, but arrived at the site of the traffic stop only after the stop had already concluded. Wherle could not remember whether Johnson's rented pickup truck was still on the scene when he arrived. Wherle testified that the only two times he has ever observed a Yeti-brand cooler used in a drug trafficking operation were the May 2018 seizure and the September 2019 arrest in this case.

Special Agent Wherle's testimony was brief and, though credible, contributed few details relevant to the issues before the Court.

### C. Defendant Osayande Johnson

3

Johnson testified that he flew from California to New York and then drove to Connecticut to attend a birthday party at Mohegan Sun. He claims that immediately upon arriving in Connecticut, a friend told him about an opportunity to buy a large quantity of low-priced cannabis. Johnson testified that his friend gave Johnson a cell phone to communicate with the seller. Johnson did not explain why his friend had the phone. Johnson testified that he then borrowed $10,000 in cash from a cousin who had the cash readily available to loan him. Johnson then drove to Elizabeth, New Jersey to retrieve what he believed to be six pounds of cannabis. Upon arriving to purchase the cannabis, Johnson says that he handed an envelope of cash to the seller without looking inside the cooler. Johnson then drove away, but claimed that he received a call from the seller telling him he was driving in the wrong direction, causing him to make consecutive right turns to course-correct. He denied committing any traffic infractions. He testified that he was pulled over and the police approached him, guns drawn, and pulled him out of the car by his arm.[1] He testified that he was then promptly cuffed, heard officers smashing at the cooler, never provided his consent to any search or seizure, and was never read his *Miranda* rights even after being transported to DEA headquarters.

Several aspects of the Defendant's testimony were implausible. Johnson refused to provide the names of any of the individuals involved, including the friend who put him in contact with the seller, the cousin who loaned him $10,000 cash, or the seller. He did not explain why his friend had the seller's phone on hand when he arrived in Connecticut. He provided no explanation for how he planned to offload six pounds of marijuana that he had not anticipated acquiring before making his scheduled return to California (or, alternatively, how he planned to transport it to California with him). He offered no plausible reason why he would make a $10,000 payment without checking to confirm whether he received what he intended to purchase. And in a broader sense, the timeline of events appears unrealistic: the Court is skeptical that Defendant arrived in New York on a red-eye flight from California, drove to Connecticut, learned of the opportunity to buy cannabis in Elizabeth, New Jersey, obtained a $10,000 cash loan from a cousin at a moment's notice, drove to Elizabeth, and then planned to return in time for the birthday party that brought him to Connecticut in the first place. These credibility issues are compounded by the Defendant's history of involvement with drug dealing, which included a 1998 conviction for selling narcotics and a 2015 conviction for the sale of a controlled substance, and by his past conviction for crimes of dishonesty—namely, a 2014 conviction for criminal simulation and forgery.

---

[1] Johnson's testimony that he was removed from the car by force is not consistent with his affidavit, in which he testified that "officers/agents surrounded my rental truck with guns drawn and screamed at me to get out of the car, which I did." Johnson Aff., ECF No. 79-3, ¶ 21.

Because the Court finds that Johnson's testimony was not credible, it affords his testimony little weight in adjudicating the facts underlying the Motion. To the extent that any portion of the findings of facts set forth below differs from Johnson's testimony, it is the result of the determinations as to credibility, relevance, and the weighing of evidence.

### III. FINDINGS OF FACT

From at least 2018 to about 2019, a team of DEA special agents and task force officers was investigating a DTO/MLO that was transporting drugs to New Jersey and elsewhere by way of shipping containers. On May 17, 2018, agents established surveillance at a location in Passaic, New Jersey where a drug transaction was underway involving the DTO/MLO. Agents watched as suspected members arrived in a black Jeep Cherokee and a Nissan Versa. The driver of the Jeep was a suspected California-based leader of the DTO/MLO who appeared to be transporting known members of the DTO/MLO to and from the meeting location. At one point, agents observed a white cargo van double-parked next to the Nissan and the driver of the van removed a large box and placed it in the rear hatch of the Nissan. Shortly after, the other cars dispersed. The following morning, the agents seized a large beige Yeti-brand cooler from the rear hatch of the Nissan. The cooler contained approximately nine kilograms of a substance that initially field-tested positive for cocaine and subsequently tested positive for heroin. Despite this seizure, the agents were unable to arrest any of the DTO/MLO members involved in the May 17, 2018 transaction.

On June 18, 2019, over a year later, the agents received information indicating that the Jeep was being used by an individual identified as Co-Conspirator 1, a member of the DTO/MLO who was laundering the drug proceeds and maintained a warehouse in Brooklyn. Co-Conspirator 1 was subsequently identified as the registered owner of the Jeep and surveillance confirmed that he operates the Jeep. On at least two occasions in June and July of 2019, the agents were forced to terminate surveillance after Co-Conspirator 1 engaged in countersurveillance measures, including making multiple right-hand turns, known as "squaring the block," as well as running a stop sign at high speed, subsequently pulling over to the shoulder, and remaining there for several minutes before re-entering the road at high speed.

In August 2019, the agents observed Co-Conspirator 1 entering and exiting multiple times from a lone shipping container located behind a warehouse in North Bergen, New Jersey. On August 6, 2019, Co-Conspirator 1 drove the Jeep to the shipping container, removed the padlock on the container's doors, entered the container, removed unknown items from the container, and placed those items in the back of the Jeep. On August 9, 2019, agents observed Co-Conspirator 1 and an unidentified man enter the shipping container, exit shortly after, and drive the Jeep to a nearby parking lot. In the parking lot, Co-Conspirator 1 and the unidentified man met with two other unidentified men inside a cargo

van, the same vehicle used to deliver nine kilograms of heroin to the Nissan in May 2018. On September 4, 2019, agents observed Co-Conspirator 1 receive a large wooden crate from a man operating a white freight truck. Co-Conspirator 1 placed the crate inside the shipping container, exited the container with two plastic bags, and drove away in the Jeep.

On September 7, 2019, agents observed Co-Conspirator 1 once again enter the shipping container and retrieve a large beige Yeti-brand brand cooler. The agents noted that the cooler was similar to the large beige Yeti-brand brand cooler they recovered from the Nissan in May of 2018. Co-Conspirator 1 placed the cooler in the Jeep and drove to an apartment building in Elizabeth, New Jersey. Approximately three hours later, agents observed the Defendant, who was driving a Nissan pickup truck, park next to the Jeep. Moments later, Co-Conspirator 1 exited the Jeep, removed the cooler from the Jeep, and placed it in the truck's bed. The Defendant remained inside the truck during the entire interaction and after the cooler was placed, both the Defendant and Co-Conspirator drove off in their respective vehicles. Agents followed the Defendant and observed him "square the block." Detective Greene observed the Defendant commit two traffic violations, failure to signal when making a turn and failure to maintain a lane, and thereafter initiated a traffic stop. Detective Greene approached the vehicle, observed that Defendant was acting erratically, and asked the Defendant what was in the Yeti-brand cooler. Defendant responded that he did not know, and thought it might be a toolbox. Detective Greene sought and obtained the Defendant's consent to search the cooler, received the key to the cooler's lock from the Defendant, and asked the Defendant to step out of his vehicle. The Court is unable to determine whether the cooler was damaged during the course of the search,[2] but ultimately the agents opened the cooler and discovered approximately five kilograms of a substance that initially field-tested positive for cocaine. Lab testing later confirmed that the substances seized from the cooler contained heroin and fentanyl. The Defendant was arrested. The Government asserts that the Defendant appeared nervous, especially when Agent Greene asked him questions regarding the contents of the cooler. The Government claims the Defendant initially told the agents that he did not know was in the cooler, then speculated it was a toolbox.

## IV. DISCUSSION

### A. Motion to Suppress Evidence from Vehicle Search

Defendant's first request for relief seeks the suppression of evidence seized from his vehicle on the basis that the search of his vehicle was unlawful. The Fourth Amendment

---

[2] The cooler was entered in evidence at the evidentiary hearing and shows signs of damage in the corner on which the lock is placed, but does not appear to be broken all the way through, such that it still could not be opened if a lock were attached. Neither party offered evidence regarding the condition of the cooler before the search and seizure.

6

forbids "unreasonable searches and seizures." Warrantless searches and seizures are presumptively unreasonable, *Katz v. United States*, 389 U.S. 347, 356-57 (1967), subject to several established exceptions. As explained in more detail below, the Court concludes that the search and seizure of evidence from Defendant's vehicle was lawful both under the automobile exception and as a lawful *Terry* stop.

### i. Automobile Exception

The automobile exception permits vehicle searches without a warrant if there is "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014) (internal quotation marks and citations omitted). The Third Circuit has recognized the "broad sweep of the automobile exception," pursuant to which a vehicle may be searched without a warrant upon a showing of probable cause that evidence of a crime may be located in the vehicle. *Id.* at 300. "Where probable cause justifies the search . . . it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* Here, there is no dispute that the Defendant was seized under the Fourth Amendment when he was pulled over. Agents had probable cause to believe that the Defendant's vehicle contained evidence of a crime when it witnessed Co-Conspirator 1 placed a beige Yeti-brand cooler in the trunk bed of Defendant's vehicle. Co-Conspirator 1 had been under surveillance by the agents for several months, was known to agents as a member of the DTO/MLO, and a similar beige Yeti-brand was recovered a year prior containing several kilograms of heroin. Special Agent Wherle expressed his belief at the evidentiary hearing that the use of a Yeti-brand cooler as a means of trafficking narcotics was, in his experience, unique to the DTO/MLO. The agents' warrantless search of the Defendant's vehicle and cooler were justified under the automobile exception. Accordingly, Defendant's motion to suppress the evidence elicited from the search and seizure of his vehicle and from the cooler are **DENIED**.

### ii. Terry *Stop*

If the automobile exception were not applicable, the evidence in dispute would still be admissible as the fruits of a lawful *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). Under *Terry* and its progeny, an officer may "conduct a brief, investigatory stop when [he] has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Courts look at the totality of the circumstances, asking if "a reasonable, trained officer standing in the officer's shoes could articulate specific reasons" to justify the seizure. *United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (brackets and internal quotation marks omitted).

Here, the agents had reasonable suspicion to conduct a *Terry* stop predicated on Defendant's commission of two traffic violations. Even if the traffic violations had not occurred, the agents' months-long investigation and surveillance of the DTO/MLO,

7

combined with Defendant's receipt of the same type of Yeti-brand cooler used in a previous narcotics operation from a suspected member of the DTO/MLO, and the Defendant's use of countersurveillance tactics collectively gave rise to at least a reasonable suspicion that the Defendant was engaged in drug trafficking sufficient to justify a *Terry* stop

Though a *Terry* stop may be lawful at its inception, it can become "unreasonable," in either its scope or duration, at some later time, giving rise to a constitutional violation. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The scope of a *Terry* stop must be limited and must involve the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest."). Based on the testimony elicited at trial, the Court is satisfied that no such constitutional violation occurred. Detective Greene's testimony that the Defendant gave oral consent to search the car and provided them with a key to the lock dampen the constitutional concerns which might otherwise attach. While it is clear that there is damage on the corner of the cooler, the Court is not persuaded that the damage resulted from the agents' actions during the seizure. For these reasons, even if the search and seizure were not permissible under the automobile exception, the Court finds that it would constitute a constitutionally permissible *Terry* stop and would still **DENY** the motion to suppress.

### B. Motion to Suppress Pre-Arrest Statements

Defendant argues that the Court suppress the Defendant's statements after he was detained by agents as fruit of the poisonous tree arising out of an unconstitutional stop, or alternatively, as custodial statements made without *Miranda* warning. As a threshold matter, because the Court concludes that the search and seizure were lawful, Defendant's fruit of the poisonous tree argument fails.

As to *Miranda*, a defendant must be warned of his right against self-incrimination and his right to an attorney before he can be subjected to custodial interrogation by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation occurs when law enforcement questions a defendant after he "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444). "[T]he ultimate inquiry is: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Vidal*, 85 F. App'x 858, 861 (3d Cir. 2004) (internal quotation marks and citation omitted). But "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010). The Third Circuit has found that "the vast majority of courts have held that police actions in blocking a suspect's

vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (collecting cases). Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into an arrest. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1993) ("There is no *per se* rule that pointing guns at people, or handcuffing them, constitutes an arrest.").

The Third Circuit has identified five factors for a court to consider when determining whether a person is in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006); *see also United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010). On the first factor, while there is no indication that Detective Greene told Johnson he was under arrest or free to leave, based on the number of officers involved, Greene's instruction to Johnson to stand by the foot of the vehicle during the search, and the blockade of police vehicles preventing Johnson from driving away, the Defendant likely would have believed he was not free to leave. On the second factor, the questioning at issue took place while the Defendant was located either in his vehicle or standing outside of his vehicle. On the third factor, it is unclear how long the questioning was, but based on the limited statements at issue, the questioning could not have lasted long. On the fourth factor, based on Detective Greene's testimony at the hearing, it is unlikely that coercive tactics were used: Greene testified that he simply asked the Defendant to exit the vehicle, did not place him in handcuffs during the search, and did not draw his weapon. Lastly, based on evidence submitted and the evidentiary hearing, the Court has determined that the Defendant did voluntarily submit to questioning. On the whole, these considerations do not indicate to the Court that Defendant was in custody during the traffic stop before he was formally placed under arrest. The motion to suppress the pre-arrest statements is **DENIED**.[3]

---

[3] Defendant's Motion does not indicate, and the Court is not independently aware of, the content of the statements that Defendant seeks to suppress, other than his answers to Detective Greene's questions during the traffic stop. If Defendant objects to the admission of specific testimony at trial, defense counsel is free to object to the same at trial as appropriate.

### C. Disclosure of Evidence Concerning Co-Conspirator 1

Defendant asks the Court to compel disclosure of evidence regarding Co-Conspirator 1, whom the Defendant believes may be a confidential informant, pursuant to *Roviaro v. United States*, 353 U.S. 53 (1957). In opposition, the Government responds that Co-Conspirator 1 was a target of the investigation, *not* an informant working with the agents. Moreover, the Government contends that Defendant's request for disclosure is premature as the Government has not produced its trial witness list or otherwise indicated to the Defendant that it does not intend to call Co-Conspirator 1 as a witness.

Because *Roviaro* only requires the disclosure of informants at this early stage, and the Government asserts that Co-Conspirator 1 is not an informant, the Defendant's request is **DENIED AS PREMATURE**.

### D. Sequestration of Witnesses

Defendant requests that all witnesses, including the Government's case agent, be sequestered pursuant to Rule 615 of the Federal Rules of Evidence. The Government argues it does not oppose sequestration of witnesses, but it does oppose the request to sequester the Government's case agent, contending the case agent's presence is essential due to the complexity of the facts and evidence in this case.

Rule 615 states in part that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses ... This rule does not authorize exclusion of ... (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause...." In *United States v. Gonzalez*, 918 F.2d 1129 (3d Cir. 1990), the Third Circuit upheld a district court order denying the defendant's motion to sequester the government's case agent, placing it in accord with its many sister circuits that "have held that the government case agent responsible for a particular investigation should be permitted to remain in the courtroom, even though the agent will often testify later on behalf of the government." *Id.* at 1138. Accordingly, the Defendant's request to sequester the government's case agent is **DENIED**. Defendant's request to sequester all other witnesses is **GRANTED**.

Defendant alternatively requests that if the case agent is permitted to remain in the courtroom, that he or she should be required to testify first. "The Government has an interest in the order of its presentation." *U.S. v. Drummond*, 69 Fed. Appx. 580, 582 (3d Cir. 2003). The Court is justified in disturbing that interest only where such a requirement would "further the trial's truth-seeking function." *See id.* at 583; *see also* Fed. R. Evid. 611(a). It is not clear at this juncture that an order requiring the case agent to testify first is necessary to further the trial's truth-seeking function. Accordingly, Defendant's request is **DENIED AS PREMATURE**.

### E. Disclosure of Uncharged Conduct Pursuant to Rule 404(b)

Defendant argues that the Court should direct the Government to immediately disclose all crimes, wrongs, or acts not enumerated in the indictment that the Government plans to introduce against the Defendant. Pursuant to District of New Jersey Standing Order No. 15-2, the timing of Rule 404 disclosures is set in a final pretrial conference held no sooner than two weeks after the disposition of pretrial motions. As no trial date has been set, Defendant's motion is **DENIED AS PREMATURE**.

### F. Early Disclosure of Jencks Material

Defendant argues that the Court should encourage the Government to disclose Jencks material no less than five business days prior to trial. Although the Jencks Act dictates that the Government must produce a witness's prior statements upon completion of that witness's direct examination, 18 U.S.C. § 3500, the Government in its opposition brief has said that it will "turn over Jencks material sufficiently in advance of trial so as to avoid delays." Defendant's request is therefore **DENIED AS PREMATURE**.

### G. Preservation of Notes

Defendant argues that the Court should order the Government's agents to preserve their rough notes under *United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983). *Ammar* requires that "the government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced." *Id.* at 259. In its Opposition, the Government did not dispute, and indeed acknowledged, its obligations under *Ammar* to preserve rough notes. *See* Opp. at 23 (ECF No. 85). The Government indicates that it would oppose any request to *disclose* rough notes prepared by investigators to defendants merely upon the Defendant's demand, but no such demand has yet been made. Defendants have identified no *Ammar* violation nor identified any reason why the Court should intervene while the Government is already in compliance with its obligations. Accordingly, Defendant's request is **DENIED AS PREMATURE**.

### H. Permission to File Additional Motions

The Government does not oppose Defendant's request for leave to file additional motions as may become necessary during continued discovery, and proffers that it does not anticipate additional discovery to occur. Accordingly, Defendant's request is **GRANTED**.

## V. CONCLUSION

For the reasons stated herein, Defendant's omnibus motion is granted in part and denied in part. An appropriate Order follows.

DATE: December 2, 2024

WILLIAM J. MARTINI, U.S.D.J.